[Cite as *Ney v. May Eng. Co., L.L.C.*, 2025-Ohio-5081.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

JEFF P. NEY,

Plaintiff-Appellant,

v.

MAY ENGINEERING COMPANY LLC et al.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 BE 0018

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 24 CV 159

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Jeff P. Ney*, pro se and

*Atty. Scott H. DeHart*, *Atty. Kenneth J. Hurley,* Zashin & Rich Co., L.P.A., for Defendants-Appellees.

Dated:  November 6, 2025

**Robb, P.J.**

{¶1} Appellant, Jeff P. Ney, appeals the April 9, 2025 judgment granting Appellee, May Engineering Company, et al. summary judgment. For the following reasons, we affirm.

Statement of the Case

{¶2} Ney filed his complaint in June of 2024 against May Engineering Company, LLC and Bryan David May (collectively May). Ney generally claims he was wrongfully terminated from his employment for an on-the-job verbal altercation allegedly involving threats of violence. Ney admitted the verbal altercation occurred but denied he made any threats of physical violence. Ney contends the company did not follow its disciplinary policy prior to his discharge. (June 21, 2024 Complaint.)

{¶3} Ney asserted five claims for relief stemming from his termination from May Engineering Company. His first claim alleges breach of an oral contract for employment. Ney asserts he had an oral employment agreement that was modified by May's modification of its company policy. Ney contends he was wrongfully discharged since May did not follow its disciplinary policy and May lacked just cause to fire him since he denies making threats of violence. (June 21, 2024 Complaint.)

{¶4} Ney's second claim for relief alleges a claim for promissory estoppel. He contends he relied on the company policy to his detriment, which was not followed prior to his discharge. (June 21, 2024 Complaint.)

{¶5} For his third count, Ney alleges he was wrongfully discharged in violation of public policy. He contends he was overseeing a public water tank project in Bridgeport, and he was terminated for raising concerns about the cost and quality of the work. Ney claims his discharge violated the public policy in favor of public works projects, which are funded by the state, from being overseen. This allegation does not cite or reference the specific rule or provisions allegedly violated. (June 21, 2024 Complaint.)

{¶6} Ney's fourth claim for relief asserts he was defamed. Ney alleges May asserted in unemployment proceedings that Ney quit. Ney claims this false statement was made to one or more people at the Ohio Department of Job and Family Services,

and May later stated Ney was terminated for violating company policy. Ney claims his reputation was injured as a result. (June 21, 2024 Complaint.)

{¶7} Ney's final claim asserts the company is responsible for May's personal conduct via the doctrine of respondeat superior. Attached to Ney's complaint as Exhibit A is a copy of two pages of the company's disciplinary policy. Attached as Exhibit B is a copy of a text message Ney received from May terminating his employment. Attached as Exhibit C is a copy of two pages of filings made in Ney's unemployment compensation proceedings. (June 21, 2024 Complaint.)

{¶8} May filed an answer and a motion for judgment on the pleadings on the same date. May's answer asserts Ney was an at-will employee, and he was terminated. It denies the remainder of Ney's claims. As exhibits to its answer, May attached text exchanges with Ney and a termination letter addressed to Ney. (August 14, 2024 Answer.)

{¶9} May's motion for judgment on the pleadings generally urged the court to dismiss the complaint in its entirety since Ney was an at-will employee who threatened a company client with physical harm. It also addressed each of the five claims on the merits. (August 14, 2024 Motion.)

{¶10} Ney opposed the motion, and May filed a reply in support. The trial court granted the motion in part and granted May judgment on Ney's claim for defamation, which was based on May's statement made during an ODJFS proceeding, which was privileged. The court overruled the motion on the remaining four claims for relief. (September 12, 2024 Judgment.)

{¶11} The court set the case for trial and issued discovery and dispositive motion deadlines. The parties exchanged discovery and took depositions.

{¶12} Ney moved to amend and/or supplement his complaint with new allegations in support of his defamation claim, which had been dismissed, based on statements made during discovery. May opposed. The trial court granted Ney leave to amend his complaint.

{¶13} Ney filed his first amended complaint in January of 2025 with the new defamation allegations. Ney claimed May "falsely stated that Plaintiff engaged in a verbal,

almost physical, altercation with a client of Company." (January 17, 2025 Amended Complaint.) May filed an answer to the amended complaint.

{¶14} On February 21, 2025, May filed a motion for summary judgment, the affidavit of Bryan David May, and the deposition testimony transcripts of Bryan David May, Jeff Ney, and Travis Snodgrass.

{¶15} Bryan David May testified to the following in his deposition. He is the owner and operator of May Engineering Company. He employs three professional engineers plus engineering interns. When May hired Ney, the company discipline policy was "in its infancy." He does not recall whether he advised Ney about it. May's offer of employment to Ney was verbal. Ney was working toward his professional engineering license during his employment.

{¶16} May said Ney had a good work ethic and paid attention to detail, but felt that Ney struggled with written and verbal communication with others. May did not maintain personnel files regarding his employees' performance or behavior.

{¶17} May recalls one incident involving Ney during which another employee, Hoover, was near tears. The other employee stated he could not work with Ney any longer. After some investigation, May learned Hoover was not "pulling his weight" on a particular job. Thus, Ney "called him out on it and called him out on some other things." (May Depo. Tr. 19-21.)

{¶18} May "counseled" Ney and warned that there should be no more outbursts and that May was in charge of discipline and employee issues. May never terminated an employee until Ney. The day May attempted to fire Ney, May tried to give Ney a termination letter and his last paycheck. May recalled that Ney "flung it back at me and said 'I don't need this, I quit.'" (May Depo. Tr. 21-22.) The termination letter states Ney was being fired for "unprofessional conduct toward a client." (May Depo. Tr. 22.)

{¶19} May explained Ney was terminated based on a series of events, which included screaming at Hoover. Further, May knew Ney had been previously terminated from a different employer. May also had to have a conversation with Ney upon the issuance of the company policy because Ney was making "snarky backhanded comments all day after receiving the manual." (May Depo. Tr. 34.)

**{¶20}** The company disciplinary policy was updated in January of 2022 and was emailed to all May employees.  When asked if employees complained about the policy, May said Ney complained about the "structured work hours."  He complained every week about the 8 a.m. to 5 p.m. work policy.  Ney said he wanted to work at a larger firm so he would not have to be "locked in" an office all day.

**{¶21}** May testified that the company policy was modified twice during Ney's employment.  May said the disciplinary policy allows the company to skip or combine disciplinary steps at its discretion.  The company adopted its policy to become eligible for certain contracts.  Certain employment policies are required to compete with bigger, national firms.

**{¶22}** The incident that lead to Ney's termination occurred at a tank site.  May explained that Ney made "such a mockery at that tank site that he was endangering my ability to service that client."  The individual with whom Ney was arguing, Snodgrass, is not only a village employee, but also the street superintendent, the code enforcer, and the sanitary superintendent.  May said Snodgrass "is my client."  (May Depo. Tr. 32-34.)  Knowing Ney's "track record," May said he had to fire him.  May met with the mayor and Snodgrass after the incident.  Snodgrass outlined Ney's overreaction to a partially open valve and how it escalated into what nearly became a physical altercation.  Snodgrass told May that Ney was screaming profanities and kicking rocks.  In light of these facts, May said this is not someone he wants to employ.  (May Depo. Tr. 33-34.)

**{¶23}** Travis Snodgrass testified in his deposition that he is the street and water superintendent for Bridgeport.  He reports to the village mayor daily.  Snodgrass was present for the Lombardy Heights project and did not notice anything being done improperly.  (Snodgrass Depo. Tr.)

**{¶24}** Snodgrass was at the job site almost daily to ensure the contractors were working.  He denies that Ney ever raised any design problems, safety issues, or cost saving measures to him.  Snodgrass denies being annoyed by questions Ney asked at the jobsite.  Before the altercation occurred, Snodgrass sent Ney a text thanking him for the help on the tank project.  Snodgrass denies knowing Ney before he worked for May on this job.  (Snodgrass Depo. Tr.)

**{¶25}** Snodgrass recalled the verbal altercation during which there was yelling that included swearing. He does not remember the actual content of the altercation, but he remembered asking Ney to go for a walk. Snodgrass thought it would deescalate the situation. (Snodgrass Depo. Tr.)

**{¶26}** Snodgrass later spoke with May and alerted him that Ney was irate, swearing, and yelling, and that Snodgrass asked him to leave the jobsite. During the altercation, Ney "rolled up his sleeves and asked if we were going to settle this like men." When Snodgrass asked him to go for a walk to deescalate the matter, Snodgrass explained how Ney assumed the two were "going to go settle this in the yard or something."

**{¶27}** Snodgrass said Ney's statements and body posture were very intimidating. He said Ney was aggressive. He appeared "[d]eranged. . . . his pupils were dilated. . . . [Ney] looked like he was going to do harm." (Snodgrass Depo. Tr. 71.)

**{¶28}** Snodgrass confirmed that Ney neither lunged at him nor touched him. Snodgrass reported the incident to Bryan May and the mayor. Snodgrass recalls telling Ney it would be best for him to leave, meaning to go and calm down. Snodgrass does not remember the exact words used by Ney, but Snodgrass testified he was in fear of his physical safety at the time. (Snodgrass Depo. Tr. 70- 72, 82.)

**{¶29}** Jeff Ney testified at his deposition that he has his professional engineer in-training license. He has a degree in civil engineering. He previously worked for CT Consultants while Bryan David May worked there as well. He acknowledged he was terminated from his employment with CT, but denied knowing the reason.

**{¶30}** Ney was subsequently hired by May and paid an hourly rate. Ney was not provided an offer letter or a written employment contract. After working for May for some time, May employees received an email from May explaining his vision for the company for the next few years, including training opportunities for employees. (Ney Depo. Tr. 28-29.)

**{¶31}** After May updated its employment policy, Ney agreed he complained about the policy in front of coworkers. Ney believes May heard him through the vents. Ney said the policy included less flexible work hours and additional rules. Ney recalled May "came storming up the stairs when I was saying that I didn't agree with the new policy, and he

told me that I was making him mad." May personally advised Ney that "if [he] followed the policy, [May] would provide employment." (Ney Depo. Tr. 55.)

**{¶32}** When asked about promises of continued employment, Ney repeatedly referenced the conversation during which May told him that if he abided by the policy, Ney would have a job. Ney also suggested he was somewhat promised continued employment via a company-wide email talking about the two-to-five-year plan for the company's future. (Ney Depo. Tr. 59-61.)

**{¶33}** When asked if Ney advised May that he felt the company was violating the law as it pertains to the Bridgeport project, Ney responded that he was not aware of violations during his employment. Ney claims he discovered certain violations after his termination. (Ney Depo. Tr. 65.) Ney explained his concerns with the project during his testimony. He explained his beliefs about things being illegal, but his testimony in this regard did not identify actual rules or codes that were allegedly violated. (Ney Depo. Tr. 75-85.)

**{¶34}** Ney says he texted Snodgrass the night before the altercation to find out if the tank was drained. Ney did not receive a response. On the morning of the altercation, Ney said Snodgrass arrived at the site and said the tank was drained. However, Ney said he made this statement despite the fact that the tank was visibly still draining. After answering a few of Ney's questions, Snodgrass became frustrated and told Ney he should "go back to work in the fucking coal mine." Ney said this derogatory statement toward him initiated the verbal altercation. Ney agrees he swore during the exchange. Ney was terminated as a result of the dispute. (Ney Depo. Tr.)

**{¶35}** May moved for summary judgment and raised the following arguments.

**{¶36}** Breach of Contract. May urged the trial court to find that Ney's breach of contract claim fails on the merits since there was no employment contract. May argued Ney was an at-will employee. May also argued there was no express or implied contract of employment, and the company's issuance of employment and disciplinary policy do not create a contract of employment. (February 21, 2025 Summary Judgment Motion.)

**{¶37}** Promissory Estoppel. Similarly, May asserted that Ney's claimed reliance on the disciplinary policy fails to establish that specific promises of job security were made to Ney. May contended that general references to the future do not overcome the strong

Case No. 25 BE 0018

presumption of at-will employment.  May also pointed out that Ney failed to establish detrimental reliance.  (February 21, 2025 Summary Judgment Motion.)

**{¶38}** Public Policy Wrongful Discharge.  Here, May urged the court to find that Ney failed to cite or reference the public policy allegedly violated.  Further, May argued that Ney failed to allege he was terminated after or as a result of identifying a violation of a rule or policy.  (February 21, 2025 Summary Judgment Motion.)

**{¶39}** Defamation.  May urged the court to find that Ney's defamation claim failed as a matter of law because the alleged defamatory statement was true, which is a defense.  Alternatively, May asserted his alleged defamatory statement was also an opinion.  By stating the altercation "was almost physical," May claimed that is a matter of opinion, not verifiable as true or false.  Further, May pointed out his statements were protected by qualified privilege as business communications.  He claimed he had a legitimate business reason to notify his employees that Ney was no longer working on the project.  Last, May urged the trial court to find the defamation claim was time barred since the action was filed after the one-year statute of limitations.  (February 21, 2025 Summary Judgment Motion.)

**{¶40}** Respondeat Superior.  Here, May argued that Ney did not assert an additional or independent claim.  Instead, Ney sought to hold the company responsible for the conduct or actions of its owner.

**{¶41}** May states in his affidavit in support of the motion that he told a few people who work for him about the Ney altercation, which almost turned into a physical altercation with a client.  The reason May told his employees about the dispute was to notify them that Ney was no longer "on the job," so they would no longer contact Ney about the project.  (February 21, 2025 Summary Judgment Motion.)

**{¶42}** Ney opposed May's motion for summary judgment and argued he had an oral employment agreement based on the fact that he worked and got paid an hourly rate in exchange.  However, Ney also acknowledges he was an at-will employee, but he argued the disciplinary policy modified the terms of his employment and created an expectation of continued employment.  Ney claimed that when May did not follow its policy, there was a breach of the agreement.  Ney also claimed to have relied on the modified employment contract to his detriment.  He refers to his testimony in which he

recalled how May said Ney could maintain his employment as long as Ney complied with the company policy. (March 14, 2025 Opposition.)

**{¶43}** Ney also argued that May discharged him in violation of public policy. Ney contends May violated the law by not "properly overseeing" the Lombardy Heights Project, including a lack of a permit, the design of a drainage pipe, payment for brush barriers, lack of receipts, and work allegedly not performed to specifications. He claims these allegations presented a question of fact as to why he was terminated.

**{¶44}** Additionally, Ney urged the trial court to strike or disregard Snodgrass' testimony as unreliable and contradictory. Ney argued May's belief that the Snodgrass statement was true is not a defense. Instead, Ney argued that only actual truth is a defense. Ney claimed May defamed him based on his reliance on statements about the altercation with Snodgrass, which were made by Snodgrass.

**{¶45}** Ney's original attorney withdrew as counsel of record, and a new attorney entered his notice of appearance on Ney's behalf. (March 30, 2025 Notice of Substitution.)

**{¶46}** May filed a reply in support of his motion for summary judgment. May argued Ney's implied contract argument lacked merit since he failed to identify the alleged specifics of the job/agreement. May also argued Ney failed to meet the heavy burden of proof and that any alleged oral promises of continued employment did not alter the at-will nature of his employment.

**{¶47}** May further relied on the fact that the company unilaterally changed the employment policy as demonstrating Ney had no ability to alter it. Thus, Ney could not demonstrate the policy was a result of mutual assent. And because an employer's compliance with its disciplinary policy is only relevant if it was mutually agreed upon, May's failure to adhere was of no consequence. To the contrary, May argued employment policies are not contractual agreements in Ohio. Additionally, May urged the trial court to conclude that the vague statement allegedly made by May, reassuring Ney about his continued employment, is unenforceable as an employment agreement. (March 20, 2025 Reply.)

**{¶48}** The trial court issued its seven-page decision and granted summary judgment in favor of May on all counts. (April 9, 2025 Judgment.) Ney appeals and raises ten assignments of error in his pro se brief.

<u>Summary Judgment Standard of Review</u>

**{¶49}** We review awards of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civil Rule 56(C), summary judgment is proper if:

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**{¶50}** The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material facts concerning the essential elements of the non-moving party's case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). The moving party must support the motion by pointing to some evidence in the record of the type listed in Civil Rule 56(C). *Id.* at 292-293. If the moving party satisfies its burden, the non-moving party has the reciprocal burden to demonstrate that a genuine issue of fact remains for trial. *Id.* at 293. The non-moving party may not rest on allegations or denials in her pleadings, but must point to or submit evidence of the type specified in Civil Rule 56(C). *Id.*; Civ.R. 56(E).

**{¶51}** "Trial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party." *Welco Industries, Inc. v. Applied Cos.,* 67 Ohio St.3d 344, 346 (1993). Doubts are to be resolved in favor of the non-movant. *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269 (1993). A court "may not weigh the proof or choose among reasonable inferences." *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121 (1980).

**{¶52}** Before reaching the merits of Ney's arguments, we note this court is a court of review, and as such, we are limited to the arguments raised and facts in evidence in

the filings in the trial court's record when it ruled on the summary judgment motion.  App.R. 12(A)(1)(b); App.R. 9(A)(1); *Christe v. GMS Mgt. Co.*, 124 Ohio App.3d 84, 88 (1997), quoting *Am. Energy Servs., Inc. v. Lekan*, 75 Ohio App.3d 205, 208 (1992).

**{¶53}**  Furthermore, App.R. 16(A)(7) requires an appellant's brief to include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."

**{¶54}**  The 11-page "Argument with Contentions" section in Ney's brief is written in the first person and appears to be his personal narrative regarding the underlying facts. A statement in this regard was not filed in the trial court, and this section of his brief lacks citation to the record.  To the extent Ney alleges facts and arguments in his brief that are not in the record, we do not consider them.  *See Matter of Estate of McDaniel*, 2023-Ohio-1065, (7th Dist.).

Assignments of Error

**{¶55}**  For ease of analysis we address Ney's arguments collectively and out of order.

**{¶56}**  His first, fourth, fifth, and sixth assignments raise arguments about the May company policy creating an implied employment agreement.  These assignments of error state:

"[1.]  The Court erred in taking the Defendants word that a company policy existed before one was emailed to May Engineering LLC employees on January 10, 2023, page one of the April 9, 2025, Motion for Summary Judgment Decision, third paragraph, under 'The facts in this matter are as follows:', No.3."

"[4.]  The Court erred in the failure to include that there are exceptions to the 'at-will' law, page three of the April 9, 2025, Motion for Summary Judgement Decision, third paragraph."

"[5.]  The Court erred in the failure to recognize that the Plaintiff's employment termination was unlawful and violated the requirement pertaining to being terminable at-will by either party for any reason not contrary to law, page three of the April 9, 2025, Motion for Summary Judgement Decision, fourth paragraph."

"[6.]  The Court erred in stating the Plaintiff relied only on the Company discipline policy to prove implied contract, neglecting to mention that there was a meeting of the minds, page four of the April 9, 2025, Motion for Summary Judgement Decision, eighth paragraph."

{¶57}  Ney contends his at-will employment with May became contractual when May adopted its employment policy in January of 2023 after his 2022 hire date.

{¶58}  In his first assigned error, Ney alleges there is a genuine issue of material fact as to the existence of an implied contract.  He claims that because he complained about the company policy changes after the issuance of the policy, and since May subsequently assured him that he will have employment if he complies with the new rules, these facts demonstrate there was negotiation and a "meeting of the minds."  Ney's argument in this regard does not contain recitation of legal authority or analysis.

{¶59}  In his fourth assigned error, Ney again argues the company policy was an implied contract.  He asserts there is no end date in the policy, so the employment agreement was infinite.  He claims May added constraints to his at-will employment thereby terminating the at-will aspect of his employment.  He cites to *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St.3d 571, 575 (1995), in support.

{¶60}  In his fifth assignment of error, Ney argues May was going to terminate him, but then the two discussed certain terms of his employment.  Ney directs us to page 38 of May's deposition testimony.  He claims May's testimony shows Ney had an implied contract of employment since he was angered in response to the surprise email containing policy changes and May assured him thereafter that Ney would continue to be employed if he complied with the new terms.  Ney claims May breached the implied contract when the company did not follow its disciplinary policy.

{¶61}  May testified to the following during his deposition:

> Q. Earlier today we also heard a little about – I believe it was January 2023 conversation with you and Jeff going outside individually.  Can you recall that situation?
>
> A.  Yeah.  I remember it very well, because that was – I think that was the angriest any person ever made me for probably a decade.  Jeff was nearly fired that day, although I never said that to him.

Jeff made snarky backhanded comments all day after receiving the manual. Then he made a comment, as I was coming up the steps, about another coworker. At that moment, both of our tempers were flared and we took the issue outside. We tried to work through it in a man-to-man human nonviolent way of how we were going to kind of resolve what he wanted and what I wanted from my firm.

It ultimately came down to – which I think I already said this once—I remember the solution was that if you want flexibility, you just got to ask.

I didn't remember what Jeff's testimony was that if you meet the document – the letter of the law, you can still work here. I don't remember that.

(May Deposition Tr. 38-39.)

**{¶62}** In his sixth assigned error, Ney contends the parties had an employment agreement based on the exchange between May and Ney after Ney complained about the issuance of the updated company policy. Ney claims there was a meeting of the minds and again refers to page 38 of May's deposition testimony. Ney also cites *Staschiak v. Certified Logistics, Inc.*, 2016·Ohio-897, ¶ 22 (11th Dist.), in support of this argument.

**{¶63}** The trial court found there was no express or implied contract of employment and that Ney was an at-will employee.

**{¶64}** Ohio is an at-will employment state. "Unless otherwise agreed, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason which is not contrary to law." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 103 (1985). In *Mers,* the court recognized there are exceptions to the doctrine. One exception to the employment-at-will doctrine is where the facts and circumstances of the employment relationship create an implied contract altering the at-will nature of the employment. *Id.*

**{¶65}** Employer handbooks and policy manuals do not generally alter at-will employment unless the parties agree otherwise. *Pastella v. Rite Aid of Ohio, Inc.*, 1995 WL 763304, *5 (7th Dist. Dec. 21, 1995). However, at-will employment may be altered into one governed via an implied contract when an employer's right to terminate an

employee is limited by an employee handbook, company policy, and/or oral representations that create implied or express contractual terms altering the at-will nature of the employment. *Rigby v. Fallsway Equip. Co.*, 2002-Ohio-6120, ¶ 13 (9th Dist.), citing *Mers*. Thus, an employer handbook and company policy are individual factors to consider in determining whether at-will employment has changed into that of employment governed by an implied contract. *Id.*

**{¶66}** Employee handbooks or policy manuals could be construed as defining the terms and conditions of an at-will employment relationship if the employer and employee manifest an intent to be bound by the terms. This requires a mutual showing of an intent to be bound by the writing. *Sexton v. Oak Ridge Treatment Ctr. Acquisition Corp.*, 2006-Ohio-3852, ¶ 14 (4th Dist.). The parties must have a distinct and common intention that has been communicated to one another. *Cohen & Co. v. Messina,* 24 Ohio App.3d 22, 24 (1985). Without a manifestation of mutual assent to be bound by the handbook or policy, the writing is a unilateral statement of rules and policies. *Napier v. Centerville City Schools*, 2004-Ohio-3089, ¶ 15 (2d Dist.); *Henning v. Marriott Hotel & Resorts, Inc.*, 1995 WL 316174, *3 (2d Dist. May 25, 1995).

**{¶67}** The May Engineering Company's Health, Safety, Security, and Environmental Policy revised in January of 2023 includes a policy governing office hours, remote work, and flex time. It states in part that every employee is to work an eight-hour work day in person and as a team. The policy offers core hours of 8 a.m. to 5 p.m. and early- and late-riser options. This policy states that except for inclement weather, all remote work must be discussed and approved in advance. (Ney Depo. Tr. Exhibit A.)

**{¶68}** The company discipline policy is set forth on page 11. It generally provides for the issuance of a warning and counseling first. And if this process does not resolve a disciplinary issue, the policy states that a formal reprimand will be issued. If this step does not sufficiently address the issue, the policy states the employer will discuss suspension and termination. The discipline policy states an employee will have an opportunity to dispute information if they believe they were wrongly accused. (Ney Depo. Tr. Exhibit A.)

{¶69}  The cover page of the company policy states it was first issued in December of 2021.  It was revised in January of 2022, and revised again in January of 2023.  (Ney Depo. Tr. Exhibit A.)

{¶70}  The trial court concluded that Ney was an at-will employee with no oral or written contract for continued employment.  The trial court found there were no specific, clear, and/or unambiguous representations of continued employment made by May.  Additionally, the trial court found the company's disciplinary policy did not create an implied contract.  The trial court emphasized that May "unilaterally modified the Policy without any input from the Defendant."  (April 9, 2025 Judgment.)

{¶71}  The two cases Ney refers to in support of these arguments on appeal are *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St.3d 571, 575 (1995), and *Staschiak v. Certified Logistics*, 2016-Ohio-897, ¶ 4 (11th Dist.).

{¶72}  In *Staschiak v. Certified Logistics*, the issue before the court of appeals was whether terms in an employee handbook created an implied contract.  The issue was not whether the plaintiff was wrongfully discharged.  Instead, the issue was whether the pay increases and health insurance benefits detailed in the handbook were enforceable.  The plaintiff filed suit for fraud and breach of contract based on the company's failure to compensate consistent with the statements in its handbook on these issues.  The *Staschiak* court found a genuine issue of fact existed as to whether a contract existed.  It distinguished cases in which the handbook had an express disclaimer indicating it was not an enforceable agreement but instead that it only contained guidelines.  *Id*. at ¶ 26-31.

{¶73}  Since *Staschiak* involved the enforcement of pay increases and benefits and not an employee's termination in violation of a policy, it is not generally applicable here.

{¶74}  In *Wright v. Honda,* Wright was hired in violation of an existing company policy that prohibited nepotism.  Allegedly unaware of the policy at the time of hire, Wright sought the advice of a friend in management who assured Wright she should "not worry."  She was employed for 7 years with high performance praises and other accolades before Wright was told she was in violation of the anti-nepotism policy.

Case No. 25 BE 0018

{¶75} Notwithstanding, Wright was later advised she could return to work. Her supervisor told her that it was "over," which Wright understood to mean the nepotism issue was resolved. The company, however, said after the fact that it had not yet made a final determination as to this policy violation. More than a month later, Wright was terminated for violating the policy.

{¶76} The Supreme Court of Ohio relied in part on the company handbooks, coupled with Wright's progress reports and promotion letters as showing that Wright's good attendance and quality of work were linked to job security. The court also relied on the assurances by supervisors that she was fine and not subject to termination for this violation. The court found a genuine issue of fact existed, explaining: "appellant has presented sufficient evidence to create a fact question as to whether Honda, through its policies, past practices, and representations altered the at-will nature of the employment agreement by creating an expectation of continued employment." *Id*. at 577.

{¶77} Employment or disciplinary policies alone generally do not create employment contracts. *McNeil v. Medcentral Health Sys.*, 2009-Ohio-3389, ¶ 23 (5th Dist.). The parties must have communicated distinct and common intentions to be bound and to consider such policy as contractual. Otherwise, employee handbooks constitute a unilateral statement of company rules. *Stembridge v. Summit Academy Mgt.*, 2006-Ohio-4076, ¶ 29 (9th Dist.).

{¶78} "[M]erely providing employees with some direction as to the likely sanction for various types of malfeasance does not operate to bind the employer to its employee in an express or implied contract." (Citation omitted.) *Id*. quoting *Ridgill v. Little Forest Medical Center*, 2000 WL 840494 (June 28, 2000).

{¶79} The burden is on the party asserting the existence of an employment contract to demonstrate the existence of each element necessary to the formation of a contract including, "the exchange of bilateral promises, consideration, and mutual assent." *Fennessey v. Mt. Carmel Health Sys., Inc.*, 2009-Ohio-3750, ¶ 18 (10th Dist.), citing *Sagonowsky v. The Andersons, Inc.,* 2005-Ohio-326, ¶ 14 (6th Dist.); *accord McMillen v. Trumbull Metropolitan Hous. Auth.*, 2007-Ohio-3713, ¶ 39 (11th Dist.).

{¶80} Contrary to Ney's arguments, the evidence shows the May company policy existed before Ney was hired. It was later revised in January of 2023 without input from

Ney. Ney testified he did not know the policy existed before he was hired. The email disseminating the new version of the policy highlighted the changes, and Ney acknowledged receipt of this email. He and May never discussed the company's discipline policy during his employment.

**{¶81}** As for the discipline policy, a plain reading of the language shows it does not contain a promise of continued employment. The policy issued via email states it was updating the prior version. The cover page of the company policy states it was first issued in December of 2021. It was revised in January of 2022, and revised again in January of 2023. (Ney Depo. Tr. Exhibit A.)

**{¶82}** Although the policy identifies a three-tiered disciplinary policy, the policy does not state all employment issues must go through this process. The policy does not suggest or preclude the fact that certain issues may be immediately terminable and not subject to the procedure. (Ney Depo. Tr. Exhibit A.)

**{¶83}** Upon receiving the updated policy, the evidence shows Ney voiced concerns and objections to the changes regarding core work hours and remote work policies. In response, May told him that if he wanted flexibility, he had to ask for it. There is nothing in evidence showing Ney made a particular request for flexible work hours or remote work or that said requests were granted or denied. There is likewise no evidence tending to show that May offered Ney infinite employment if Ney complied with the specifics of the company policy. Ney's objections to the policy updates did not concern the disciplinary policy.

**{¶84}** To the extent that May, as the owner of the company, allegedly advised Ney that as long as he complied with the company's updated policy, Ney would continue to be employed, we agree that a statement in this regard is too general to be enforceable. The communication lacks specific promises of job security to rise to the level of an implied contract or promissory estoppel. *See Tarantine v. Loral Corp.*, 1990 WL 163877, *4 (9th Dist. Oct. 24, 1990) ("To establish a claim based on promissory estoppel, the plaintiff must demonstrate that there was a promise clear and unambiguous in its terms.") Further, the concerns Ney was raising at this juncture were his dissatisfaction with the company's updated policy on remote work and core work hours—Ney did not challenge or raise

concerns about the disciplinary policy such that there was a "meeting of the minds" on this issue.

**{¶85}** And unlike the facts in *Wright*, Ney does not direct us to his job accolades or excellent performance reviews. May never advised Ney he could maintain his job after the tank altercation. To the contrary, May testified that Ney's employment was previously in jeopardy based on Ney's behavior after receiving the updated employment policy. May also noted he knew Ney had previously been terminated from another job, in addition to the incident during which Ney was screaming at a coworker. May testified that Ney was counseled about this incident.

**{¶86}** Moreover, the assurances of job security that Ney directs us to were in response to his objections to the company's job flexibility and remote work policies. May allegedly told Ney that if he wanted flexibility, he simply had to ask. There is no evidence the two discussed infinite employment in exchange for Ney's compliance with the company's policy updates.

**{¶87}** Our review of the evidence fails to reveal any statements which could reasonably be construed as representations that Ney was anything other than an at-will employee. In light of the foregoing, Ney failed to present evidence demonstrating an implied employment contract existed, and as such, summary judgment was appropriate. Thus, Ney's first, fourth, fifth and sixth assignments lack merit.

**{¶88}** Ney's second, seventh, eighth, and tenth assigned errors concern his claim he was discharged for raising public policy violations. These assigned errors assert:

"[2.] The Court erred in the failure to include that the Plaintiff's 'dispute' or 'encounter' was related to 'competent oversight' as required by Ohio public policy, page one of the April 9, 2025, Motion for Summary Judgement Decision, third paragraph, under 'The facts in this matter are as follows:' No. 4."

"[7.] The Court erred in rationalizing that the Defendants could not terminate my employment for things that I did not know or express to them. The Court's/Judge Chris Berhalter's public policy violation causation failed requirement explanation is flawed. The wrongdoings are applicable to the OAC Rules cited, page five of the April 9, 2025, Motion for Summary Judgement Decision, fifth/last paragraph."

"[8.] The Court erred in rationalizing that there was no overriding element, stating that Plaintiff was terminated for a dispute, page six of the April 9, 2025, Motion for Summary Judgment Decision, first paragraph."

"[10.] The Court erred in stating reasonable minds can only reach one conclusion, page seven of the April 9, 2025, Motion for Summary Judgement Decision, third paragraph."

{¶89} Each of his four assignments of error on this topic fail to fully develop arguments on appeal. Nevertheless, in the interest of justice, we attempt to ascertain and address his arguments.

{¶90} Ney's third claim for relief in his amended complaint alleges one of his job duties was "oversight of a public water tank project" and May's discharge of Ney jeopardized the public policy that "public works projects funded by the State be properly overseen." Ney further alleged his discharge was in part "to cover up legitimate concerns raised by Plaintiff related to the cost and quality of the work[,]" and May lacked an overriding business justification for his discharge. (January 17, 2025 Amended Complaint.) Thus, to the extent Ney raises additional allegations, we disregard them. App.R. 12(A)(1)(b).

{¶91} Ney's second assigned error asserts he was terminated while functioning as "competent oversight" as required under OAC Rule 164-1-19, governing emergency projects. He claims the tank was not drained as required. Ney claims Snodgrass was not "competent oversight;" project funding was misused; and they failed to secure proper permits regarding tank cleaning and water pollution.

{¶92} In his seventh assignment of error, Ney alleges he informed May of "cost overruns" and questioned how the contract was advertised and bid "as law requires." He claims he found "Ohio Public Works Commission documents which proved wrongdoing." Ney references OAC Rule 164-1-19 and Rule 164-1-21 and seems to allege the project lacked "competent oversight" necessary to receive certain funds and the project was not properly bid. He also avers there were cost overruns and the defendant was untruthful with the OPWC.

{¶93} In his tenth assigned error, he contends reasonable minds can disagree and that the "post-employment discoveries of the Plaintiff regarding the wrongdoing relates

directly to the Plaintiff's termination." He again claims funds were misspent on the tank project and the project was not bid as the law requires. He also restates there was a lack of competent oversight and certain permits regarding tank cleaning and pollution were not obtained.

**{¶94}** The tort of wrongful termination in violation of public policy, also known as a *Greeley* claim, is an exception to the employment-at-will doctrine. *House v. Iacovelli*, 2020-Ohio-435 (2020). To establish the tort of wrongful discharge in violation of public policy, one must show:

> 1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

(Emphasis sic*.*) (Citations omitted.) *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70 (1995). The clarity and jeopardy elements are questions of law to be determined by the court. *Id*. at 70. The causation and overriding-justification elements are questions for the factfinder.

**{¶95}** On this count, the trial court held:

> Plaintiff argues that the Defendants violated Ohio law while serving as engineers for the Lombardy Heights Water Tower Project. Plaintiff further alleges in his answer Defendants would be displeased with any finding of fault. Therefore, according to the Plaintiff's complaint, the Defendants terminated his employment to cover up legitimate concerns raised by the Plaintiff.
>
> First, applying the clarity element, Plaintiff cites Four Administrative Codes, OAC Ann. 164-1-19 (Emergency Projects), OAC Ann. 164-1-23 (Project Cost overruns and underruns), OAC Ann. 164-1-24 (Project Audit

Requirements), and OAC Ann. 164-1-40 (Project Schedule). Therefore, assuming all inferences in favor of Plaintiff, he has met the clarity element.

Second, the jeopardy element is applied to the four (4) administrative codes cited by the Plaintiff. A review of every one of these Administrative Code sections by the Court leaves the Court with no answer as to how the Plaintiff believes these sections were violated. As an example, OAC Ann. 164-1-19 is titled Emergency Projects. It provides that the director will review a request for funding of an emergency project and determine whether it is an emergency and whether to fund it based on certain factors. In this matter, Plaintiff was working for the Defendants on a project with the Village of Bridgeport. Defendants did not approve funding for this project nor determine if it was an emergency. The Director did. Thereby, there is no evidence that OAC Ann. 164-1-19 could be violated by the Defendant's termination. The remaining three administrative codes are similarly inapplicable to any allegation in this matter. Therefore, the Plaintiff's discharge cannot jeopardize these.

With this finding, the Court need not go any further. That aside, continuing to do so does not improve the Plaintiff's position. In applying the causation element, the Plaintiff raises a litany of problems with the project in question that he claims to have discovered. Yet, these problems are not applicable to the Administrative Codes he cited. Even if they were, the overwhelming number of these issues he claims he discovered were discovered by him after he was terminated by the Defendants. Thereby, he never conveyed them to the Defendants while in their employment (Ney Transcript Page 123, Line 10 to Page 126, Line 8). If the Plaintiff never conveyed this information to the Defendants, how could the Defendants discharge the Plaintiff based on it? The answer is they could not. The causation element has clearly not been met.

Even the overriding element cannot be met. Plaintiff was terminated by Defendant after an incident with Snodgrass. Whether it was, as Plaintiff describes a simple verbal dispute or a verbal, almost, physical altercation

does not matter.  The evidence clearly demonstrates Plaintiff's employment was terminated due to this incident.  Defendant May also added that there were prior issues with the Plaintiff as well.  (May transcript, Pages 19-23). (April 9, 2025 Judgment.)

**{¶96}** The four Administrative Code sections cited by Ney in the trial court proceedings are:  OAC Ann. 164-1-19 (Emergency Projects), OAC Ann. 164-1-23 (Project Cost overruns and underruns), OAC Ann. 164-1-24 (Project Audit Requirements), and OAC Ann. 164-1-40 (Project Schedule).

**{¶97}**  As the trial court found, Ney identified these provisions such that he met the clarity element of identifying a clear public policy existed in the administrative code. However, a review of Adm.Code 164-1-19 and the allegations herein do not show how this provision was violated or Ney was terminated in contravention to it.  This provision governs funding for emergency projects.

**{¶98}**  A review of Adm.Code 164-1-23, shows it dictates what the director of the Ohio public works commission and the "project applicant" are directed to do when addressing project overruns and underruns.  "Project applicant" is defined as: "the subdivision or group of subdivisions which submitted a request for financial assistance to a district." Adm.Code 164-1-01.  Thus the project applicant is typically a local government entity.  Neither May nor Ney were the director or the project applicant such that we can ascertain how this policy or provision was violated when Ney was terminated.

**{¶99}**  The third section Ney referenced, Adm.Code 164-1-24 identifies project audit requirements. It provides in part that project funds are subject to state fund audit requirements.  It also sets forth rules for project applicants to follow when dealing with audit findings.  It is not evident how this provision applies or how it was violated by Ney or May as neither was the project applicant, director, or administrator.

**{¶100}**  The final section Ney relied on was Adm.Code 164-1-40.  This section governs public works project schedules. It sets forth rules about when projects are to be commenced.  It also provides for extensions based on project delays.  It is unclear how Ney's termination from his employment violated or even related to this section of the administrative code.

Case No. 25 BE 0018

**{¶101}** Our analysis begins and ends with the first two elements, i.e., 1. a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation (the *clarity* element), and 2. that dismissing employees under circumstances like those involved in the plaintiff's dismissal jeopardizes the public policy (the *jeopardy* element).

**{¶102}** As the trial court found, Ney satisfied the clarity element by identifying sections of the administrative code. However, consistent with the trial court's findings, we cannot ascertain how Ney's dismissal from his employment by May jeopardized the public policies set forth in the cited sections.

**{¶103}** The contentions in Ney's complaint do not allege violations of any of the sections of the Ohio Administrative Code that he cites. It is not our function to construct arguments on appeal. *Matter of Estate of McDaniel*, 2023-Ohio-1065, ¶ 57-59 (7th Dist.).

**{¶104}** As the trial court found, there is no evidence showing how these Ohio Administrative Code Sections were violated by May's decision to terminate Ney. Furthermore, Ney's termination did not implicate any of the cited regulations or public policy embodied in these sections. Thus, we end our analysis here and conclude that Ney's discharge did not "jeopardize" these provisions or public policies. Accordingly, Ney's second, seventh, eighth, and tenth assigned errors lack merit and are overruled.

**{¶105}** Ney's third and ninth assignments of error arise from his claim for defamation. These assigned errors assert:

"[3.] The Court erred in the failure to include that the Defendant Bryan May was repeating unproven information that was defamatory to the Plaintiffs' character and caused harm suffering, page one of the April 9, 2025, Motion for Summary Judgment Decision, third paragraph, under 'The facts in this matter are as follows:', No. 7."

"[9.] The Court erred in stating that the Defendant did not defame the Plaintiff. The Defendant was telling people that the Plaintiff was challenging clients to fist fights; it was like saying RAPE, page six of the April 9, 2025, Motion for Summary Judgement Decision, second paragraph; Page 7, paragraph 1 and 2, as well."

**{¶106}** Ney's third assigned error asserts May lied to the Ohio Department of Job and Family Services during the unemployment proceedings, to the Ohio Public Works Committee, and to the Village of Bridgeport about Ney. Ney claims May repeated the

false story recited by Snodgrass about how he felt threatened. Ney asserts whether Snodgrass was lying about the altercation "almost becoming violent" is a disputed fact and a credibility determination for the trier of fact.

**{¶107}** To the extent Ney raises arguments concerning May's statements made to the ODJFS during unemployment proceedings, the trial court granted May's motion for judgment on the pleadings in part. It held Ney's claim for defamation, based on May's statement made during an ODJFS proceeding, was privileged. (September 12, 2024 Judgment.) Ney has not appealed from this decision.

**{¶108}** Additionally, to the extent Ney raises further claims or arguments of defamation not raised to the trial court, e.g., defamatory comments made to the Ohio Public Works Committee and the Village of Bridgeport about Ney, we cannot consider them. App.R. 12(A)(1)(b); *Christe v. GMS Mgt. Co.*, 124 Ohio App.3d 84, 88 (9th Dist. 1997).

**{¶109}** Ney filed his first amended complaint in January of 2025 with a new defamation allegation. Ney alleged May "falsely stated that Plaintiff engaged in a verbal, almost physical, altercation with a client of Company." (January 17, 2025 Amended Complaint.) Thus, our review is limited to this allegation and arguments concerning it.

**{¶110}** Ney's ninth assignment of error contends the court erred as a matter of law by finding May's statement to a small group of coworkers was privileged and subject to qualified immunity.

**{¶111}** To establish a defamation claim, a plaintiff must prove:

(1) the defendant made a false and defamatory statement concerning another; (2) the false statement was published without privilege to a third person; (3) the plaintiff was injured; and (4) the defendant acted with the required degree of fault that was defamatory per se or caused special harm to the plaintiff.

*Janiszewski v. Belmont Career Ctr.*, 2017-Ohio-855, ¶ 69 (7th Dist.), citing *Anzevino v. DePasquale*, 2016-Ohio-883, ¶ 16 (7th Dist.).

**{¶112}** The trial court held that Ney made a prima facie case of defamation. Neither side disputes the prima facie finding, and as such, we do not address this issue. The trial court also held May's statement was protected by qualified privilege.

Case No. 25 BE 0018

{¶113} "A qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it. Frequently, in such cases, there is a legal, as well as a moral, obligation to speak." (Citations omitted.) *Hahn v. Kotten*, 43 Ohio St.2d 237, 244 (1975). The business communication privilege requires a defendant to show good faith; an interest to be upheld; the statement was limited in its scope to its purpose; and the statement was made in a proper manner, to the proper parties, and at a proper occasion. *Id.*

{¶114} To defeat a qualified privilege, a plaintiff must establish by clear and convincing evidence that the communication was made with actual malice. *A & B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1 (Ohio 1995). Actual malice means "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Id.* Reckless disregard is shown by clear and convincing proof that the false statements were made with a high degree of awareness that they were likely false or the defendant "entertained serious doubts" as to the truth of the statements. *Varanese v. Gall,* 35 Ohio St.3d 78, 80 (1988).

{¶115} "Generally, a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Hatton v. Interim Health Care of Columbus, Inc.*, 2007-Ohio-1418, ¶ 14 (10th Dist.), quoting *Hanley v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 81 (10th Dist. 1991).

{¶116} Here, the statements in question were made by May to other employees working on the project with Ney. According to May, the intent of the communication was to convey that Ney was no longer on the project. (May Depo. Tr. 55-56). Consistent with his testimony, the court found the statement was made for the limited purpose of communicating information to other employers who were reporting to Ney. Thus, the court found Ney could only prevail upon a showing of actual malice. And because May relied on Snodgrass's version of what occurred with Ney, the trial court found Ney could not prove actual malice. (April 9, 2025 Judgment.)

{¶117} We agree. May testified that he told his employees about the altercation between Snodgrass and Ney to alert them to the fact that Ney was no longer on the job

and thus, they should no longer contact him about the work.  The statement was limited in its purpose, scope, and occasion.  There is nothing showing May made the statement with malice or with a high degree of awareness that it was likely false.  There is nothing tending to show May made the statement knowing it was false or that May entertained serious doubts about the veracity of the statement.

**{¶118}** As the trial court found, May relied on the version of events conveyed by Snodgrass, and Snodgrass testified consistent with the version of events relayed by May.  We agree with the court's determination that the statement was privileged.  Accordingly, Ney's third and ninth assigned errors are overruled.

<u>Conclusion</u>

**{¶119}** In light of the foregoing, no genuine issue of fact remains.  We affirm the trial court's decision.

Hanni, J., concurs.

Dickey, J., concurs.

—————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**